Filed 6/4/24  P. v. Puentes CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>RICARDO PUENTES II,<br><br>    Defendant and Appellant. | A159926<br><br>(Sonoma County Super.<br>Ct. No. SCR4985671) |

Ricardo Puentes II, appeals from his conviction for second degree murder, attempted murder, and assault (Penal Code[1] §§ 187, 245, subd. (b), 664), challenging the trial court's denial of his motion for a new trial. Puentes was tried 13 years after the shooting.  Shortly after the trial concluded, Omar Chavez, who had been convicted as an aider and abettor many years earlier and had already served his sentence by the time of Puentes' trial, telephoned Puentes' trial counsel, Kristine Burk, asking why she never contacted him and explaining that he would have corroborated Puentes' claim that he acted in self-defense.  Chavez stated that he, like Puentes, observed one of the victims, Semere Girmai, reach for a gun in his waistband before Puentes fired.  No other witness saw Girmai do so.

---

[1] Further undesignated statutory references are to the Penal Code.

Puentes' new counsel prepared and submitted a declaration from Chavez and moved for a new trial based on ineffective assistance of counsel.

The trial court held an evidentiary hearing on the motion, at which Chavez and Burk—who had been replaced by new defense counsel—testified. Burk stated that her failure to contact Chavez to learn his version of events was an oversight, not a tactical choice. Chavez obtained the assistance of counsel at the hearings and at times invoked his Fifth Amendment privilege against self-incrimination. Later, after the trial court found he had waived the privilege as to matters in his declaration or about which he had already testified, Chavez confirmed his previous statements and provided further detail.

The court denied the motion for a new trial. Without deciding whether Burk's failure to interview Chavez constituted deficient performance, the court concluded that there was no prejudice because Puentes had not shown a reasonable probability that (1) Burk would have called Chavez to testify; (2) Chavez would have testified; and (3) Chavez's testimony would have led to a more favorable result for Puentes. We will affirm the judgment for the reasons explained below.

## BACKGROUND

### I. The Trial

The shooting occurred at the apartment of Melissa F. in 2005.[2] People in the room included Melissa F., Matt M., Max R., Puentes, Chavez, and the two victims—Girmai, who was killed, and Rafael C., who was injured by a bullet that passed through his wrist and struck his shoulder. Because Matt M.'s testimony largely framed the prosecution's presentation of evidence, we

---

[2] We refer to certain individuals by their first name and last initial in accordance with rule 8.90 of the California Rules of Court.

rely primarily on his account to describe the prosecution's case. Matt M. noted, however, that he "was drinking a lot that night," he had been smoking marijuana and probably used cocaine, and he had trouble remembering the details.

### A. Matt M.'s Testimony

Matt M. left Melissa F.'s apartment with two young women and ran into Chavez (whom he considered a friend) and Puentes near a restaurant parking lot. In the parking lot, Puentes got into the car with the two women and Matt M. got into Chavez's car. Matt M. and Chavez discussed returning to Melissa F.'s apartment to try to "squash" a disagreement that had built up between Chavez and Girmai in the past couple of months. Matt M. did not provide significant detail, but like Matt M. himself, Chavez and Girmai were drug dealers, and he said that the disagreement in part concerned taking clientele, with the dispute causing people in their group of friends to take sides between Girmai and Chavez. Matt M. was friends with both of them, and wanted to help them resolve their differences.

Both cars returned to Melissa F.'s apartment. The two women went upstairs to the apartment and Puentes got back into Chavez's car, where Matt M. and Chavez discussed getting marijuana and continued to talk about the rift between Girmai and Chavez. Chavez drove the three of them to a house; Puentes went inside and returned about five minutes later. Matt M. did not see that Puentes had any marijuana and no one smoked marijuana. They drove back to Melissa F.'s apartment. Outside the apartment, Matt M. said he was not sure they should go inside. Puentes said, "Let's just go up there." Puentes wanted to smoke marijuana and may have said something about the two women. Matt M.'s main concern was to have Chavez and Girmai talk.

3

When they entered the apartment, Matt M. walked toward the living room, near Max R.  Girmai was seated with Rafael C. at the dining room table.  Chavez greeted Girmai and shook his hand.  Girmai asked Matt M., "Why did you bring these mother fuckers here?" referring to Chavez and Puentes.  In his 2005 statement to police, Matt M. stated that Girmai also said "these fools are gonna get clapped," meaning that they were going to be shot.  At trial, although Matt M. was more tentative, he agreed that Girmai "said something under his breath like that."  Within 10 or 15 seconds of Girmai's first statement, Matt M. observed Puentes pointing a gun at Girmai.  Matt M. did not see Girmai stand up or reach for anything; his hands were on the table.  When Matt M. saw Puentes shooting Girmai, he reached for his own gun in the waistband of his pants, but it fell down his pant leg and got stuck.  He ran away, jumping out a second story bathroom window and discarding his gun as he ran.

Matt M. had a gun for protection because he was in a gang, dealing drugs, and "everybody" around him had a gun.  Matt M. knew Girmai to carry a gun and had previously seen him with one.  Girmai was affiliated with the Crips gang and "was active with that community."  Matt M. also was affiliated with the Crips.  Chavez was affiliated with the Norteños, but Matt M. did not believe he was a gang member.  Chavez's and Girmai's gang associations did not impact their group of friends.

Girmai had started getting "crazy" and "a little emotional" in the recent past; "[h]e always . . . wanted to start shit" and he never calmed down.

### B. Puentes' Testimony

Puentes testified that, after dropping the two women off at Melissa F.'s apartment, Chavez drove him and Matt M. to his home to obtain marijuana. He did not retrieve a gun; as a drug dealer, he already had one on him.

4

Heading back to Melissa F.'s apartment, Puentes was thinking of "socializ[ing] and "smok[ing] some weed." He did not hear Chavez and Matt M. discuss Girmai. After Puentes entered the apartment, Girmai was looking at him and Chavez, and Puentes heard him say, "Why did you bring these mother fuckers?" Puentes felt "alarmed," and then heard Girmai say, looking at Puentes, "You're dead." Girmai reached his right hand into the right side of his waistband and "grab[bed] a gun." Puentes saw Girmai's hand on the handle and the top corner of the gun. Fearing for his safety, he then pulled out his own gun and shot as fast as he could. Puentes did not use all his ammunition and stopped shooting when it appeared Girmai could not shoot him back. He did not realize at the time that he had also shot Rafael C.

On cross-examination, Puentes explained that both he and Chavez associated with Norteño gang members. Puentes also had friends who were Crips; Crips and Norteños at that time hung out together.

## C. Other Testimony

Both in 2005 and prior to Puentes' 2018 trial, Rafael C.—who already had multiple felony convictions—contacted prosecutors and offered to testify and "do whatever" in exchange for leniency in his then-pending criminal cases. For example, in July 2017, while in custody, he left voicemails for the district attorney, urging that it would be to the prosecution's advantage in the case if he were out of custody, and that "[o]therwise, like I don't know if I can play ball."[3] However, Rafael C. testified that no one from the District Attorney's office ever responded to his requests and he never received a benefit for his testimony. With respect to the shooting, Rafael C. testified

[3] At trial, Rafael C. testified that the phrase "play ball" did not refer to his cooperation as a witness and that he meant he did not know "if I can go through with going to prison."

that Girmai turned toward Chavez when he shook his hand and said, "what the fuck." Rafael C. saw Puentes reach into his jacket, pull out a gun, and start firing. He did not see Girmai with a gun that night or see him reach for a gun or take his hands off the table. When Puentes began shooting, Rafael C. stood up and said: "What the fuck?" Puentes shot at Girmai, then twice at Rafael C., and then at Girmai again, and had to move his gun to shoot both of them.

Melissa F. saw Chavez shake hands with Girmai. She turned to close the door and heard gunshots while her back was turned. Immediately afterward, she called a friend of Girmai named Zula, a "Crip gangster drug dealer" who threatened to retaliate against her if she spoke to law enforcement. Rafael C. called 911 as Chavez and Puentes ran out of the apartment. Melissa F. first testified that she went through Girmai's pockets to retrieve drugs, and that she did not find a gun when she was searching them. After a weekend break in the trial, she contacted the prosecution's investigator and told him that her testimony was mistaken; when re-called to the stand, she explained that she had no recollection of searching Girmai's pockets, and on re-cross, she stated affirmatively that she did not go through them and could not explain why she previously testified that she did. She did retrieve cocaine from the kitchen table and flush it down the toilet because either Rafael C. or Zula told her to. She was under the influence of cocaine, alcohol, and methamphetamine that night. When law enforcement officers interviewed her, she lied to them about the drugs in her apartment, Matt M.'s name, and who had been present, among other things. Melissa F. did not recall seeing Girmai with a weapon that night, which was consistent with what she told an investigator in 2005. But a few weeks before the shooting,

she had seen Girmai produce a gun when he said something that caused a conflict with the people with whom he was speaking.

## D. Closing Argument and Verdict

The prosecution did not settle on a single theory of Puentes' motive to kill Girmai. Principally, it argued that Puentes decided to kill Girmai before going to Melissa F.'s apartment in response to the rift between Chavez and Girmai, which Puentes must have heard Matt M. and Chavez discussing, notwithstanding his denials. Alternatively, it suggested that Puentes later decided to kill Girmai because he "felt disrespected" when Girmai asked, "why did you bring these mother fuckers?" In rebuttal, after the defense questioned whether either of these hypotheses made sense, the prosecution emphasized that it did not have to prove motive, observing that "[s]ometimes we may never have that answer as to why somebody does something."

With respect to the claim of self-defense, the prosecution emphasized that Puentes was the only person who testified that Girmai had or reached for a gun, and argued that his testimony on this point should be questioned as self-serving. (The jury instructions also advised that the jury could consider whether any witness had a personal interest in how the case was decided.) The prosecution also contended that Puentes' testimony was inconsistent with the physical evidence, including the trajectory of the bullets that killed Girmai and the shooting of Rafael C.

The jury found Puentes not guilty of first degree murder and first degree burglary, thus rejecting the prosecution's theory that Puentes had formed an intent to kill Girmai before entering Melissa F.'s apartment. But it found him guilty of the second degree murder of Girmai, guilty of the attempted murder of Rafael C., and guilty of assault with a semiautomatic firearm.

7

## II.  Motion for New Trial and Hearing

Several months after the verdict, Puentes moved for a new trial based on his counsel's failure to interview Chavez.[4]  The court heard evidence and argument on the motion on multiple days.

### A. Chavez's Testimony

When Puentes first called Chavez to testify at the hearing, without Chavez's counsel present, Chavez twice asserted his Fifth Amendment privilege but on each occasion nonetheless provided responsive information. He explained that, when he entered the apartment with Puentes, he observed Girmai seated at the dining room table and, just before he heard gunshots, saw him pull a gun out of his waistband.  He saw enough of the gun "to be scared" and to know he "was in danger."  Before pulling the gun out, Girmai said to Matt M., "why did you bring these mother fuckers[?]"  At that point in Chavez's testimony, the court stopped him and asked whether he would like to have an attorney present.  After speaking with his attorney by telephone, Chavez was willing to resume testimony, but the court continued his testimony until his attorney could attend.

When Chavez later returned to the stand with counsel, he invoked the Fifth Amendment as to all questions related to the crime.  On cross-examination, Chavez testified that whether he would have invoked his Fifth Amendment privilege at Puentes's trial would have "depend[ed] on whether I conferred with my attorney."  While he would have followed his attorney's

---

[4] Chavez's first two trials for Girmai's murder resulted in hung juries. On the eve of his third trial, he pled guilty to involuntary manslaughter with an enhancement under section 186.22, subdivision (b)(1), that the crime was done at the direction of, for the benefit of, or in association with a criminal street gang.  It appears from counsel's comments at the hearing that the trial court was provided with certain transcripts from Chavez's trials, and Burk received them in discovery, but they are not part of the record on appeal.

advice if he spoke with him, "had I just impulsively went on the stand, I would not have pled the Fifth." Chavez could not say whether he would have asked for an attorney, and whether he would have invoked his privilege at trial would have depended on the questions asked.

After briefing, the court concluded that Chavez had waived his Fifth Amendment privilege as to the matters in his declaration and those to which he had already testified. Chavez then affirmed the truth of the facts in his declaration and answered further questions. Chavez was friends with Girmai, who "always had a firearm on him." Matt M. and Chavez discussed the need to "squash everything" between Chavez and Girmai. When they went to the apartment, however, "the whole purpose . . . was to hang out with girls," not specifically to try to resolve things with Girmai. Shortly after Chavez heard Girmai say "Why did you bring these mother fuckers here?" he saw him "pulling out a gun from his waistband." Chavez could not see Puentes, who he believed was behind him. Chavez thought he "was about to get shot." The next thing Chavez "remember[ed] was seeing blood come out of [Girmai's] head." Chavez was in shock. Rafael C. jumped up from the table and yelled something. Chavez did not remember Rafael C. getting shot. After they left the apartment, Puentes told Chavez, "I had to do what I had to do because we were going to get shot."

### B. Burk's Testimony

Burk testified that her investigator did not interview Chavez prior to trial, and that she did not speak to Chavez or his counsel before the jury verdict. She knew that Chavez was in the apartment when the shooting occurred, and that in two trials he was charged as an aider and abettor with the same crimes as Puentes. She did not know what he would have said happened that night, and although she knew he was no longer incarcerated,

9

she did not have anyone try to locate him.  She explained that it was an "oversight"; it was not a tactical decision but instead a "blind spot" because typically Chavez would have been a codefendant in the same trial, and "codefendants are so often just hands off.  We don't get to talk to them. They're represented by counsel, and they're sitting next to you."  She never consciously decided not to interview or call Chavez as a witness.

Burk spoke to Chavez for the first time when he telephoned her shortly after the verdict.  He told her "that he would have confirmed what [] Puentes said, that [Girmai] had a gun.  That [Chavez] believed [Puentes had] saved [his] life or something like that."  If Burk had known what Chavez told her, and if she was determining whether to call him to testify, she "would have had to consider a myriad of issues," including his possible gang affiliation. Because there was relatively little evidence of Puentes' gang involvement, the gang allegations against him were dismissed.[5]  There was evidence, however, that Girmai and Matt M. were both affiliated with the Crips, and that fact furnished one approach Burk could use to discredit Matt M.'s testimony.[6] Burk wanted to keep evidence of Puentes' possible gang ties out of the trial because the jurors would not like it and it could be used against him to show motive.  Burk was also concerned that the more substantial evidence of Chavez's affiliation with the Norteños could have negatively impacted

---

[5] As Burk explained, Chavez was in one respect better situated than Puentes, in that he was not the shooter, but in another respect, he "had a more substantial gang history that put him in some jeopardy in his trial in a way that I didn't believe the People had evidence as to Mr. Puentes."

[6] Burk ultimately did not rely on Matt M.'s and Girmai's shared gang affiliation to impugn Matt M.'s credibility.  In her closing argument, she characterized Matt M. as "the least biased, but most impaired witness from the evening."  She added, "He is immature, he is irresponsible, but it does appear that he tried to be mostly honest about what his memory was."

Puentes. If Chavez testified, more gang evidence could have been admissible, and the prosecution would probably have impeached him with it.

With respect to Chavez's credibility, Burk testified that she still did not have enough information to form an opinion about whether his account of the shooting was truthful. Asked whether she agreed that it is helpful to have a corroborating witness for a defendant who claims self-defense, she answered that she did not think the question has a "black and white" answer, because while corroboration is helpful, "you have to evaluate what other costs and what other issues it brings up."

## III. The Trial Court's Ruling

The court declined to determine whether Burk's oversight constituted deficient performance, instead finding any error not prejudicial. Even had Burk contacted Chavez, the trial court found, there was no reasonable probability that (1) Burk would have called Chavez to testify; (2) Chavez would have testified, rather than invoke his privilege against self-incrimination; and (3) even if Chavez testified, the jury would have returned a verdict more favorable to Puentes. The court identified 12 reasons that it believed supported the latter point, including the prosecution's ability to undermine Chavez's credibility; the testimony of other witnesses refuting Puentes' claim of self-defense; physical evidence undermining Puentes' claim that he shot only in Girmai's direction; circumstantial evidence that Puentes went to the house intending to shoot Girmai; the absence of a firearm found on or near Girmai when the police arrived minutes after the shooting; and

Chavez's and Puentes' flight from the scene, and Puentes' flight from the jurisdiction for many years, as evidence of consciousness of guilt.[7]

## DISCUSSION

### I. Standard of Review

The parties disagree as to the standard we apply to review the trial court's denial of Puentes' motion for a new trial. Puentes argues that we apply independent review at least to the question whether counsel's alleged error prejudiced him, relying on *People v. Nesler* (1997) 16 Cal.4th 561, 582 and footnote 5 (lead opn. of George, C. J.) (*Nesler*), *People v. Callahan* (2004) 124 Cal.App.4th 198, 209 (*Callahan*), and *In re Resendiz* (2001) 25 Cal.4th 230, 248–249, abrogated on other grounds, *Padilla v. Kentucky* (2010) 559 U.S. 356, 370. The Attorney General argues, also relying on *Callahan*, at pages 209–212, along with *People v. Ault* (2004) 33 Cal.4th 1250, 1265 (*Ault*), and *People v. Hoyt* (2020) 8 Cal.5th 892, 956–962 (*Hoyt*), that we apply a deferential abuse of discretion standard.

Although the cases are not entirely consistent, Puentes has the better argument. (See *People v. Albarran* (2007) 149 Cal.App.4th 214, 224, fn. 7.) The lead opinion in *Nesler* has been adopted in cases that have specifically considered the standard of review for a new trial motion, including *Ault* and *Callahan*, on which the Attorney General relies. (*Ibid.*; *Ault, supra,* 33 Cal.4th at pp. 1255, 1260–1270; *Callahan, supra,* 124 Cal.App.4th at p. 209; cf. *Whitlock v. Foster Wheeler, LLC* (2008) 160 Cal.App.4th 149, 158 &

---

[7] We note, however, that the prosecution ultimately elected not to introduce evidence of Puentes' long absence from the jurisdiction because, in a pretrial ruling, the court held that the defense would be permitted to introduce evidence of certain crimes that transpired after the shooting (which the prosecution sought to exclude) to show that Puentes may have fled because he feared for his safety rather than because of consciousness of guilt.

162, fn. 3 [relying on *Nesler* and *Callahan* for standard of review in civil appeal].)  The *Callahan* and *Ault* courts agree that the *Nesler* rule controls insofar as the appellate court is reviewing the trial court's *denial* of a new trial motion, particularly where the motion implicates a significant constitutional issue.  (*Ault*, at pp. 1266–1267; *Callahan*, at pp. 209–212; see *People v. Albarron*, at p. 224, fn. 7; cf. *People v. McCurdy* (2014) 59 Cal.4th 1063, 1108 [applying abuse of discretion standard to denial of new trial motion based on evidentiary issue].)  In both *Ault* and *Callahan*, however, the courts concluded that the abuse of discretion standard applies on review of a trial court's *grant* of a new trial motion, a distinction the Attorney General elides.  (*Ault*, at p. 1272; *Callahan*, at p. 209; see also, e.g., *People v. Knoller* (2007) 41 Cal.4th 139, 156.)  And while it is true that *Hoyt* applied an abuse of discretion standard to the denial of a new trial motion asserting ineffective assistance, there is no indication that the defendant in *Hoyt* advocated for independent review.  (See *Hoyt*, *supra*, 8 Cal.5th at pp. 956–962.)  Because " ' "[i]t is axiomatic that cases are not authority for propositions not considered," ' " (*People v. Gray* (2023) 15 Cal.5th 152, 169, fn. 5), *Hoyt* is not controlling on that question.  For the same reason, we decline to rely on *People v. Wallin* (1981) 124 Cal.App.3d 479, 483.

Upon review, therefore, we "accept the trial court's credibility determinations and findings on questions of historical fact if supported by substantial evidence.  [Citations.]  Whether prejudice arose from [counsel's ineffective assistance] is a mixed question of law and fact subject to [our] independent determination."  (*Nesler*, *supra*, 16 Cal.4th at p. 582; see also *People v. Taylor* (1984) 162 Cal.App.3d 720, 724–725.)

13

## II. Ineffective Assistance

Criminal defendants have " 'the right to the effective assistance of counsel at trial . . . . A defendant claiming ineffective representation bears the burden of proving . . . (1) that counsel's performance was deficient, i.e., that the representation fell below an objective standard of reasonableness, and (2) that there is a reasonable probability that, but for counsel's unprofessional errors, the result would have been more favorable to defendant . . . .' " (*In re Lucas* (2004) 33 Cal.4th 682, 721; see *Strickland v. Washington* (1984) 466 U.S. 668, 688 (*Strickland*).)  Burk's admission that it was an "oversight" not to contact Chavez, a critical witness, suggests deficient performance, at least in failing to interview him to learn whether and how he would testify.  (*In re Long* (2020) 10 Cal.5th 764, 777; *Cannedy v. Adams* (9th Cir. 2013) 706 F.3d 1148, 1159–1162.)  However, we need not resolve that question definitively because we conclude that Puentes has failed to show prejudice in any event.

To evaluate prejudice, "[w]e examine what 'evidence counsel failed to discover and present in this case' and whether there is 'a reasonable probability that a competent attorney . . . would have introduced it' [citation], and then we address whether 'there is a reasonable probability that [the jury] would have returned' a different verdict if it 'had . . . been confronted with [that] evidence.' " (*In re Long, supra,* 10 Cal.5th at p. 778.)  "A reasonable probability is a probability sufficient to undermine confidence in the outcome" (*Strickland, supra,* 466 U.S. at p. 694), which is less than a preponderance of the evidence (*Cannedy, supra,* 706 F.3d at p. 1162) but enough to cause " 'at least one juror . . . [to strike] a different balance.' " (*In re Lucas, supra,* 33 Cal.4th at p. 734.)

14

## A. Whether Counsel Would Have Called Chavez to Testify

Puentes must show a reasonable probability that a competent attorney would have called Chavez to testify after learning what he would say. (*In re Long*, *supra*, 10 Cal.5th at p. 782.) Although Burk was not directly asked whether she would have done so, she acknowledged that there would have been downsides, including Chavez's credibility issues and the prosecution's ability to introduce his affiliation with the Norteños and other gang evidence, which could have buttressed its theory of motive. She was unable to form an opinion of the truthfulness of Chavez's account, and agreed that she would have had to consider his guilty plea as well as potentially contradictory statements he reportedly made to his girlfriend about the killing and Puentes' role in it.

On the other hand, the key prosecution witnesses had significant credibility issues. As the jury was aware, Matt M. and Rafael C. were drug dealers, had gang affiliations, and possessed multiple felony convictions. Matt M. testified under a grant of immunity. Rafael C. had a history of trying to solicit favors from the prosecution in exchange for offering "whatever." Melissa F. initially lied to law enforcement, had attempted to dispose of evidence at the crime scene, and gave inconsistent testimony about going through Girmai's pockets. The witnesses also made statements in 2018 that were inconsistent with their prior reports to law enforcement in 2005. The passage of time, along with the witnesses' use of multiple controlled substances that night, impaired their ability to recall the events accurately. Moreover, because Puentes' testimony was self-serving, the jury also had reason to doubt it. The prosecution made that very point in closing argument, and emphasized that his testimony was not corroborated by other

witnesses. Chavez's testimony could have helped Puentes address this problem.

On balance, although we recognize the possibility that the risk calculus might have militated against Burk calling Chavez—because arguably his testimony could have opened the door to more gang evidence and pointed to a possible conspiracy between Chavez and Puentes to murder Girmai—we think a reasonably competent defense lawyer likely would have taken the gamble and tried to call Chavez as a witness given the weaknesses of Puentes' case for self-defense without some corroborative evidence. For the reasons explained below, however, with the benefit of hindsight as to how Chavez actually testified at the motion hearing and of the trial court's findings with respect to that testimony, we are not persuaded that there is a reasonable probability that putting him on the stand as a defense witness would have resulted in a more favorable verdict for Puentes.

**B. Whether Chavez Would Have Testified**

The trial court found it was likely that Chavez would have invoked his privilege against self-incrimination, as he did when he was called as a witness at the hearings on the new trial motion—hesitatingly when he first appeared without counsel, and in response to nearly every question when he returned with his attorney. The trial court concluded that, if Burk had thought to interview Chavez, she likely would not have proceeded without contacting Chavez's lawyer. This is a reasonable inference. Burk testified at the new trial hearing that she considered codefendants to be "hands off." Consistent with this testimony, before Puentes' trial, she moved to exclude any statements Chavez made to Matt M., arguing that "I can't confront and cross-examine Chavez about what he said, what he thought, what he did." But regardless of what Burk would have done, we see no reason to conclude

16

that Chavez would not have contacted his attorney before testifying, since that is what he did even though it was his decision to reach out to Burk in the first place. And Chavez acknowledged that he would have followed his attorney's advice to assert his Fifth Amendment privilege.

Puentes contends that he could have overcome any assertion of the privilege because Chavez had already been convicted, had admitted a gang enhancement as part of his guilty plea, and the risk that he could still face federal Racketeer Influenced and Corrupt Organizations Act (RICO) charges (18 U.S.C. § 1961 et seq.), based on his gang involvement—which Chavez's counsel identified as the basis for invoking the privilege—was imaginary and insubstantial. The trial court was not persuaded by that argument, and we agree that Puentes' assertion that the risk of federal prosecution was remote is insufficient to show error. "[T]he Fifth Amendment does not allow 'the court to assess the likelihood of an actual prosecution in deciding whether to permit the privilege.' " (*People v. Capers* (2019) 7 Cal.5th 989, 1011 [quoting *People v. Seijas* (2005) 36 Cal.4th 291, 305].) "Ultimately, a trial court may reject an assertion of the privilege only when it appears to the court " '*perfectly clear*, from a careful consideration of all the circumstances in the case, . . . that the answer[s] *cannot possibly* have [a] tendency' to incriminate." (*People v. Trujeque* (2015) 61 Cal.4th 227, 267 [quoting *Hoffman v. United States* (1951) 341 U.S. 479, 488]; see also Evid. Code § 404 [once a witness shows that proffered evidence might tend to incriminate them, the "evidence is inadmissible unless it clearly appears to the court that the proffered evidence cannot possibly have a tendency to incriminate the person claiming the privilege"].)

Puentes argues that the five-year statute of limitations for any RICO conspiracy would surely have run for any crimes in 2005 by the time Chavez

testified in 2018. But by their nature and design, RICO prosecutions have expansive reach. (See, e.g., *United States v. Pizzonia* (2d Cir. 2009) 577 F.3d 455, 460, 467 [rejecting statute of limitations challenge to RICO conspiracy charges where indictment relied on pattern of racketeering activity beginning 18 years prior to indictment and no specific predicate offense was proven to have occurred within limitations period]; *United States v. Masters* (7th Cir. 1991) 924 F.2d 1362, 1365, 1368 [RICO conspiracy charges for predicate offenses beginning 18 years prior to indictment were not untimely, even where last predicate offense occurred six years before indictment, because conspiracy continued].) And given the broad protection afforded to those invoking the privilege, the " 'witness need not be guilty of any offense; rather, the privilege is properly invoked whenever the witness's answers "would furnish a link in the chain of evidence needed to prosecute" the witness for a criminal offense.' " (*People v. Williams* (2008) 43 Cal.4th 584, 613–614.)

Applying those principles, we agree with the trial court that Chavez had reason to fear that his testimony might provide a link in a chain of evidence allowing various predicate crimes to be swept up in a wide-ranging RICO conspiracy prosecution. As the court explained, the predicate crimes could include narcotics violations, violent crimes, aiding and abetting Puentes' flight after the murder, and intimidating a witness, assuming any such offenses could be connected over time via a pattern of Chavez's asserted gang-related activity.[8] Accordingly, we conclude that Puentes has not established a reasonable probability that Chavez would have testified at trial.

---

[8] With respect to Chavez's invocation of the privilege at the hearing on the new trial motion, the trial court also believed that cross-examination could potentially subject him to a perjury prosecution based on the sworn declaration submitted in support of the motion, in the event his answers

## C. More Favorable Result

Even assuming that Chavez would have testified, whether voluntarily or based on Puentes overcoming any assertion of the privilege against self-incrimination, we do not find it reasonably probable that his testimony would have led to a more favorable result. The trial court cited 12 reasons in support of its conclusion that it was not reasonably probable that a jury would have reached verdicts more favorable to Puentes if Chavez's testimony was offered at trial. Without necessarily endorsing all of them, applying independent review and deferring to the trial court's factual findings where supported by substantial evidence, we agree with the trial court's ultimate conclusion.

We must weigh the proposed new evidence against the strength of the prosecution's case. (See *In re Long, supra,* 10 Cal.5th at p. 784; e.g., *In re Jackson* (1992) 3 Cal.4th 578, 605, disapproved on other grounds, *In re Sassounian* (1995) 9 Cal.4th 535, 545, fn. 6 [due to strength of prosecution's case, failure to uncover impeachment evidence regarding two of prosecution's witnesses was not prejudicial].) The only matter at issue here is whether Puentes shot Girmai in self-defense. The prosecution presented two witnesses, Matt M. and Rafael C., who testified that they saw Girmai at

revealed that any part of his declaration was untrue. The issue on appeal, however, is whether Chavez would have been able to invoke the privilege if he had been called as a witness at trial. There is no suggestion that the declaration would have existed in that counterfactual scenario, so the potential for a perjury charge related to it is not relevant. For the same reason, we do not find relevant Puentes' argument that his reported testimony would now be available in any retrial as former testimony under Evidence Code section 1291, subdivision (a)(2). The prejudice inquiry requires us to assess what likely would have happened had Chavez been called as a witness at Puentes' original trial.

the time of the shooting and that he did not reach for a gun before Puentes shot him. Melissa F. did not recall seeing Girmai with a gun that evening. No gun linked to Girmai was ever recovered. The fact that Puentes shot Rafael C. in addition to Girmai, and that he would have had to adjust his hand position to do so, also undermined Puentes' claim that he shot Girmai in self-defense. Although Puentes testified that Girmai made threatening statements and started to pull out a gun, his testimony on the latter, critical point was not corroborated. Considering the totality of the evidence, Chavez's ability to corroborate Puentes' account would have been quite important to the defense—were it believed. But after presiding over Puentes' trial and the evidentiary proceedings on the new trial motion, the trial court found that Chavez's testimony, overall, was not credible. We defer to this factual finding, which weighs substantially against any conclusion that a more favorable result was probable.

In addition, the trial court and the Attorney General have highlighted the "double-edged" nature of Chavez's potential testimony. (*In re Andrews* (2002) 28 Cal.4th 1234, 1257–1258.) On the one hand, Chavez would testify in a manner consistent with Puentes' account of self-defense. But on the other hand, as Burk testified, with Chavez on the stand, additional evidence regarding his and Puentes' potential gang affiliations and activities might very well become admissible. That evidence would not only cast Puentes and Chavez in a generally negative light in the jury's eyes, at least according to Burk, but it could also tend to support the prosecution's theory that Puentes and Chavez planned to murder Girmai, a theory that the jury otherwise rejected. (Cf. *United States v. Harden* (9th Cir. 1988) 846 F.2d 1229, 1231–1232 [failure to call witness with prior felonies and credibility issues, where evidence against defendant was significant, was not prejudicial].)

For all of these reasons, we conclude that Puentes has not established a reasonable probability that Chavez's testimony would have resulted in a more favorable verdict.

## DISPOSITION

The judgment is affirmed.

                                                            GOLDMAN, J.

WE CONCUR:

BROWN, P. J.
STREETER, J.

21